AO 91
Rev. 11/97

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>LENNY KYLE DYKSTRA | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>11- **11    0788M** |

Complaint for violation of Title 18, United States Code Section 153: Embezzlement Against Bankruptcy Estate

| NAME OF MAGISTRATE JUDGE<br><br>HON. SUZANNE H. SEGAL | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br><br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE<br><br>Between on or after July 7, 2009 and on or before June 15, 2010 | PLACE OF OFFENSE<br><br>Ventura and Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN)<br><br>FILED<br>CLERK, U.S. DISTRICT COURT<br>APR 1 3 2011<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY                    DEPUTY |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Between on or about July 7, 2009 and on or about June 15, 2010, defendant LENNY KYLE DYKSTRA, a person who had access to property or documents belonging to an estate by virtue of the person's participation in the administration of the estate as a trustee, custodian, and other officer of the court and as an agent, employee, and other person engaged by such an officer to perform a service with respect to the estate, knowingly and fraudulently appropriated to his own use, embezzled, spent, and transferred property belonging to the estate of a debtor, namely a Maitland-Smith Handcrafted Dresser.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>Ty Thomas          /s/ |
|---|---|
| | OFFICIAL TITLE<br><br>SPECIAL AGENT -- FEDERAL BUREAU OF INVESTIGATIONS |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)    *Suzanne H. Segal* | DATE<br><br>April 13, 2011 |
|---|---|

.) See Federal Rules of Criminal Procedure rules 3 and 54.

JMM/ REC: Detain

## AFFIDAVIT

I, Ty A. Thomas, being duly sworn, depose and state:

I.   INTRODUCTION

1.   I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI"), and have been so employed for approximately 5 years.  I am currently assigned to the Bank Fraud/Mortgage Fraud Squad of the Los Angeles Field Office of the FBI.  As an FBI Special Agent, I have investigated various types of federal financial crimes, including mortgage fraud, bankruptcy fraud, bank fraud, identity theft, and wire fraud.  My experience includes interviewing witnesses, gathering documents, analyzing financial documents, swearing and executing search warrants, swearing and executing arrests, conducting surveillance, serving grand jury subpoenas, and providing grand jury testimony.  I have also received formal training in investigating financial crimes such as bank fraud, wire fraud, mail

-1-

fraud, mortgage fraud, and money laundering.

2.    This affidavit is made in support of an application for a criminal complaint and arrest warrant for LENNY KYLE DYKSTRA ("DYKSTRA") for a violation of Title 18, United States Code, Section 153 (Embezzlement Against Estate).

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various FBI agents and witnesses.  This affidavit is intended to show that there is sufficient probable cause for the requested complaint warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## SUMMARY OF INVESTIGATION

4.  DYKSTRA filed a Chapter 11 bankruptcy petition on July 7, 2009, and listed various items of personal property as part of the bankruptcy estate.  Through witness interviews and a review of evidence, it appears that after DYKSTRA filed for bankruptcy, he sold many items belonging to the bankruptcy estate that were in his custody and destroyed and hid other estate items. The Bankruptcy Trustee's attorney, Robert Huttenhoff, estimated that DYKSTRA stole and destroyed over $400,000 in estate property.  DYKSTRA admitted under oath to arranging the sale of two pieces of estate property that had been in his custody, including the Maitland-Smith dresser.

## PROBABLE CAUSE

### I.  The Bankruptcy Estate

5.  On July 7, 2009, DYKSTRA filed a Chapter 11 bankruptcy petition with the Central District of California, San Fernando Valley Division, in case number 1:09-BK-18409-GM.  On or about November 30,

2009, the bankruptcy court entered an order converting the bankruptcy case from a Chapter 11 case to a Chapter 7. As part of my investigation, I have reviewed the DYKSTRA bankruptcy file and learned the following from my review:

a. On July 7, 2009, DYKSTRA listed the following real property as property of the Bankruptcy Estate:

i. 1072 Newbern Court, Westlake Village, CA (the "Newbern Residence"). This property has been referred to in bankruptcy filings as both the Newbern Residence and Sherwood Home because it is located in Lake Sherwood Estates.

ii. 2672 Ladbrook Way, Westlake Village, CA ("Ladbrook property").

b. On August 10, 2009, DYKSTRA filed additional bankruptcy schedules. In those schedules he claimed that, as of August 10, 2009, the Newbern Residence was worth $18,500,000.00 and the Ladbrook property was worth $5,400,000.00. He also listed the following

personal property, among others, on the Schedule B as part of the bankruptcy estate:

  i. Household goods and furnishings in possession of Terri Dykstra, Stafford Road, with a value of $60,000.00.

  ii. Household goods and furnishings at the Newbern Residence, with a value of $15,000.00.

  iii. Other personal effects, books, pictures etc. in DYKSTRA's possession, with a value of $5,000.00.

  iv. Other personal effects, books pictures etc. in the possession of Terri DYKSTRA, DYKSTRA's then-wife, with a value of $5,000.00.

  v. Artwork located at the Newbern Residence, with a value of $15,000.00.

  vi. Clothing, with a value of $5,000.00.

  vii. Jewelry, antiques, art, memorabilia etc., with a value of $100,000.00.

  viii. Weight room and gym equipment at the Newbern Residence with a value of $10,000.00.

## II. Removal of Property of the Bankruptcy Estate

6.    According to Huttenhoff, whom I interviewed on November 12, 2010, and March 31, 2011, and according to information detailed below, since the inception of DYKSTRA's bankruptcy filing on July 7, 2009, DYKSTRA removed, destroyed, and sold property of the Bankruptcy Estate between July 2009 and at least July 2010 that was in his custody, without the Trustee's permission or authority.

### A.    July 2009 Sale to Uniquities

7.    During his interview on March 31, 2011, Huttenhoff told me:

a.    Huttenhoff obtained from an insurance company a two-page receipt from "Agate Storage and Printing" dated July 8, 2009, one day after DYKSTRA filed for bankruptcy.  The insurance company representative stated that DYKSTRA had given the receipt to the company.  That receipt purports to list items packed, moved, and delivered from the Newbern Residence to Uniquities, a consignment store, located

at 215 S. Barrington in Los Angeles.  The items on the receipt include chandeliers, mirrors, artwork, a stove, sconces, a grandfather clock, fireplace screens, andirons, and potted trees.

b.  In addition to the moving receipt, an attorney representing the owner of Uniquities and the owner of Beverly-Wilshire Jewelry & Loan, a pawnshop, gave Huttenhoff receipts for cash paid to DYKSTRA on August 4 and August 5, 2009.  The owner of Uniquities told Huttenhoff that DYKSTRA had showed up with a rented U-Haul van or truck and had opened up the back and asked the owner how much he would pay for the items contained therein.  The owner of Uniquities purchased these items, including furniture from DYKSTRA and paid him cash, as reflected in the receipts from the pawnshop.

**B.   Removal of property from the Camarillo Office**

8.  I have reviewed the declaration of Huttenhoff filed in the Bankruptcy Court on or about October 20, 2010.  In that declaration, Huttenhoff stated:

a.    When DYKSTRA purchased the Newbern Residence for approximately $18.5 million, the purchase contract included all of the furnishings and artwork, but did not itemize the value of any personal property. However, DYKSTRA's realtor told Huttenhoff that the furnishings and artwork were valued at $1 million.

b.    DYKSTRA claimed under oath at his first Meeting of Creditors in his Bankruptcy case, that his housekeeper's son stole "everything" from the Newbern Residence after DYKSTRA had filed for bankruptcy. DYKSTRA also stated that he had not reported the theft to authorities because of his longstanding relationship with his housekeeper.

c.    Huttenhoff spoke with DYKSTRA's housekeeper, Candy Lopez, who denied that her son Miguel Lopez had stolen the property and stated instead that she had first-hand knowledge of DYKSTRA having disposed of personal property before and after the first Meeting of Creditors.

d.   DYKSTRA claimed at his first Meeting of Creditors that he had stored the fixtures removed from the Newbern Residence at Uniquities.   However, as noted above, Huttenhoff spoke to the owner of Uniquities, who stated that DYKSTRA had not stored any fixtures at Uniquities but rather had sold the fixtures to Uniquities.

e.   Huttenhoff described having personally visited an office maintained by DYKSTRA at the Camarillo Airport ("Camarillo Office") before personal property was removed and saw office furniture, desks, a wine refrigerator, sports memorabilia, and a safe.

f.   Huttenhoff stated that he spoke to DYKSTRA repeatedly before February 6, 2010, and warned DYKSTRA not to remove personal property from the Camarillo Office.

g.   On February 6, 2010, Huttenhoff spoke to DYKSTRA by telephone and again warned DYKSTRA not to remove personal property from the Camarillo Office, and that doing so could be a crime.   DYKSTRA "gave his

word" to Huttenhoff that he would not remove personal property from the Camarillo Office.

      h.  However, within minutes of that conversation, DYKSTRA loaded up a moving van with personal property from the Camarillo Office.[1]

**C.  EBay and Craigslist Postings of Estate Property**

      9.  In the Chapter 7 Trustee's Complaint filed June 18, 2010, the Trustee attached printouts of online listings evidencing that DYKSTRA had sold or attempted to sell Estate property.  The printouts include:

      a.  Craigslist Posting ID 1732327210, showing that on or about May 9, 2010, DYKSTRA sports memorabilia was listed for sale for $3,200.

      b.  eBay Item Number 300437390237 showing that on or about June 15, 2010, an eBay seller named "safetyuser" advertised for sale a "Maitland-Smith Handcrafted Dresser" that names the previous owner as DYKSTRA.

---

[1]DYKSTRA testified that he removed property from the Camarillo Office to ensure its safety and to prevent its disposal.

c.    eBay Item Number 300436042274, showing that on or about June 15, 2010, an eBay seller named "safetyuser" advertised for sale an "Executive Custom Hand Made Mahogany Desk" stating "this was taken out of a 15 million dollar mansion that was owned by Lenny DYKSTRA/Wayne Gretzsky [sic].  I also included a pic of him at his new penthouse in Westwood, Calif.  The day I purchased a lot of his furniture.  This desk is the coolest thing ever, with secret doors that open up. He purchased from Custom Made Craft in San Fernando Valley.  It was purchased for the price of 10,000.00 dollars!!!".

10. During his interview on March 31, 2011, Huttenhoff told me that the three items listed for sale above in paragraph 9 (desk, dresser, and memorabilia) were property of the bankruptcy estate and that DYKSTRA did not have permission to sell them and that DYKSTRA did not give the proceeds of any sale to the Bankruptcy Trustee.

**D.    Advantair, Inc., Owner of Camarillo Office**

11. I interviewed Lili Dellinger on February 11 and April 7, 2011, who stated in substance the following:

a. Between September 2009 and January 2010, DYKSTRA leased office space from Dellinger's employer, Advantair, Inc., located at 575 Aviation Drive, Camarillo, CA at the Camarillo Airport.  All the contents of the leased space were brought there by DYKSTRA and DYKSTRA hired contractors to build out the space to his specifications.  During the lease period, Dellinger observed the following items in DYKSTRA's Camarillo Office: granite sinks, cabinets, four flat-screen televisions, antique vanity, antique credenza, two desks, and a wine refrigerator.

b.  DYKSTRA told Dellinger that he ripped out the sink from his mansion and that it was a $50,000 sink, and that he had taken granite from the mansion and installed it in the Camarillo Office.

**E.    DYKSTRA's Testimony Regarding Personal Property at the Camarillo Office and the Newbern Residence**

12.  I have reviewed the transcript of DYKSTRA's testimony given at his first Meeting of Creditors on December 21, 2009.  In substance, DYKSTRA testified as follows:

a.  The Newbern Residence had only "minimal" furniture and personal property, which DYKSTRA valued at $15,000;

b.  DYKSTRA (who bought the Newbern Residence fully furnished from Janet and Wayne Gretzky) let Janet Gretzky take back some of the furniture, including some couches;

c.  Miguel Lopez, the son of DYKSTRA's maid Candy Lopez, stole items from the Newbern Residence, including big screen televisions, computers, pool table, and watches, but DYKSTRA did not report the theft because of his relationship with his maid and because he was negotiating with an insurance company at the time.

d.   The $5,000 in miscellaneous property, including books, pictures, and effects, listed in his prior bankruptcy filing were either already in his Camarillo Office or soon would be in that office.

e.   DYKSTRA discovered a leak at the Newbern Residence and hired experts, who recommended doing destructive testing inside the house to discover the source of the leak.  Because his experts also told him to remove anything of value from the Newbern Residence before conducting the destructive testing, DYKSTRA stored some artwork with Uniquities and obtained a receipt.  DYKSTRA said that he had heard that Uniquities had used the artwork to "stage" other properties and that he was not sure where the artwork was that had been stored at Uniquities, but thought that Uniquities had stolen the items.  He also testified that he had not reported the fact that he believed the artwork had been stolen by Uniquities.

13.   I have reviewed the transcript of DYKSTRA's testimony given at a continued Meeting of Creditors and

Rule 2004 deposition on April 23, 2010 December 21, 2009.  In substance, DYKSTRA testified as follows:

a.  There was not much furniture at the Newbern Residence because DYKSTRA's wife Terry took 10-15 items and because desks and other items were moved to DYKSTRA's Camarillo Office.

b.  His 2008 financial affidavit listed $160,000 of memorabilia.

c.  DYKSTRA had some items "tucked away" at the Camarillo Office.

d.  Miguel Lopez had backed up a rental truck to the Newbern Residence and taken the pool table, four flat-screen televisions, five computers, DYKSTRA's clothes, cufflinks, and watches.

e.  The stoves from the Newbern Residence were stolen and DYKSTRA did not receive anything for them.

14.  On October 7, 2010, DYKSTRA testified under oath at another bankruptcy hearing.  I have listened to portions of an audio recording of that hearing, and heard DYKSTRA testify that:

a.   DYKSTRA's assistant Victorya Moreno stole money from DYKSTRA's account as well as fixtures, televisions, and other items from the Newbern Residence in July 2010, after DYKSTRA had gone back into the Newbern Residence and thrown a party there.

b.   Moreno had placed the fixtures and other items stolen from the Newbern Residence into a Public Storage Unit that was rented in Moreno's name.

c.   He did not recognize the July 22, 2010, email from his email account to Moreno, discussed in detail below, in which the author (purportedly DYKSTRA) suggests that Moreno sell fixtures from the Newbern Residence and split the proceeds with DYKSTRA.

d.   DYKSTRA admitted that he gave an item of memorabilia, discussed above in Paragraph 9a in Craigslist PostingID 1732327210, to his friend Peter Neil, for Neil to sell.  DYKSTRA said he did so because DYKSTRA needed to eat, but that he did not think that Neil had given DYKSTRA any money and that DYKSTRA did not know whether the item had been sold.  Before giving

it to Neal, the memorabilia had been located at the Camarillo Office.  (DYKSTRA previously testified at the meeting of creditors that he would store this item and would not dispose of it.)

e.  DYKSTRA also admitted that he sold the "Maitland-Smith" dresser mentioned in Paragraph 9b above as eBay Item Number 300437390237, for $400 or $500.  This item was located at the Camarillo Office. DYKSTRA said he had tried to limit what he sold as much as he could, but he sold this item for $400 or $500 because he "had to eat."

**F.    Moreno's declaration regarding the Newbern personal property**

15.  As the attorney for the Trustee, Huttenhoff interviewed Victorya Moreno, who said that she worked as an executive assistant for DYKSTRA from March or April 2010 through July 25, 2010.  Moreno provided Huttenhoff with a declaration signed on or about September 20, 2010, under penalty of perjury, which Huttenhoff filed in the bankruptcy case.  I have

reviewed the declaration and it states, in substance, the following:

a.   Moreno began to work for DYKSTRA as his "executive assistant" beginning in March or April of 2010 through July 25, 2010, in exchange for approximately $1,000 per week in cash.  Moreno was responsible for organizing DYKSTRA's e-mails and legal documents, additional clerical work, arranging set-up of utilities, cooking, cleaning, and generally managing DYKSTRA's personal affairs.

b.   As DYKSTRA's assistant, she was tasked with helping him throw a party at the Newbern house on July 10, 2010.  At DYKSTRA's request, Moreno paid for party supplies with her own credit card, which totaled $3,848.00.  Additionally, Moreno rented a storage unit and vehicle for DYKSTRA at his request with her personal credit card, under the promise from DYKSTRA that he would reimburse Moreno for the costs.  The Public Storage unit was located at 11200 W. Pico Blvd, Los Angeles, California.

c.  On July 11 and 12, 2010, DYKSTRA instructed Moreno to arrange to move items from the Newbern Residence and from a penthouse on Wilshire Boulevard where DYKSTRA was residing ("Wilshire Penthouse") to a Public Storage unit, which she did.  The items removed and placed in storage included: two armoires, multiple antique chairs, two 50-inch televisions, electronic components, light fixtures, chandeliers, silver- and gold-plated doorknobs, door hinges, furniture, multiple paintings, artwork, and collectible books.  DYKSTRA told Moreno the artwork was worth approximately $50,000 to $100,000 and the collectible books were worth approximately $30,000 to $50,000.

d.  Moreno also stated that the Wilshire Penthouse storage unit contained other items that had been removed from the Newbern Residence on or about July 12, 2010, including plumbing fixtures, chandeliers, books, and newspapers.

e.  In addition, Moreno stated that [after the bankruptcy filing], she observed the following items in

the Wilshire Penthouse that DYKSTRA acknowledged were
previously located at the Newbern Residence: a 60-inch
flat screen television, four computers, and expensive
furniture.

      f.  When she quit working for DYKSTRA, who had
failed to fully pay Moreno's salary and reimburse
Moreno for the party supplies and the Public Storage
unit expense, Moreno emptied the Public Storage unit of
its contents and left the items outside of the unit.

      g.  On July 22, 2010, Moreno received an email
from DYKSTRA's email account to Moreno's email address,
with a time stamp of Thursday, July 22, 2010 at 3:19
p.m.  In the email, DYKSTRA disputed the amount that
DYKSTRA owed to Moreno and proposed that Moreno sell
the "gold bathroom fixtures from his Sherwood Home –
that are probably worth at least $20K –and split it
[the proceeds]."  Moreno did not agree to DYKSTRA's
proposal.

h.   On July 25, 2010, Moreno received another email from DYKSTRA's email account.[2]  The July 25, 2010 email acknowledges that Moreno had paid for a rental car and the Public Storage Unit for DYKSTRA with her own personal credit card.  The email then stated "it was grossly unprofessional to remove all Lenny's items from storage and stack them in the dumpster, especially when I was more than willing to come down there and take over the payment of the unit and leave you with no financial responsibility or any work to do.  This act alone is telling."

i.   Moreno quit her job with DYKSTRA on July 25, 2010.

16.  Moreno was interviewed by the FBI on January 21, 2011.  During that interview, Moreno stated the following:

a.   On or about July 11, 2010, at DYKSTRA's direction, Moreno arranged for Eliseo (DYKSTRA's maid's husband), Richard Robinson (Moreno's roommate's

---

[2] DYKSTRA's assistant Dorothy Van Kalsbeek testified at an October 7, 2010, bankruptcy hearing that she had drafted this email.

husband), and Hermand (DYKSTRA's maid's brother-in-law) to move items selected by DYKSTRA from the Newbern Residence to the Wilshire Penthouse and the Wilshire Penthouse's storage unit. The items that DYKSTRA directed be moved included light fixtures, chandeliers, paintings, garage items, silver/gold-plated door knobs, hinges, books, and furniture.

     b. DYKSTRA also asked Moreno to sell the items that were moved, but Moreno refused to do so.

### G. Dunning Declaration Regarding Wilshire Penthouse Property

17. I have reviewed the declaration of Tricia Dunning filed with the bankruptcy court dated on or about November 29, 2010. The declaration states in substance the following:

     a. Dunning was DYKSTRA's housekeeper beginning on August 8, 2010, and worked at the Wilshire Penthouse.

     b. On August 9, 2010, DYKSTRA ordered Dunning to bubble-wrap personal property at the Wilshire

Penthouse and at the Wilshire Penthouse's storage unit, and that she get everything out of the penthouse and storage unit on the same day.

c.  Dunning bubble-wrapped two crystal chandeliers, door knobs, "expensive plumbing fixtures (approx. 30) and multiple sconces."  She also removed sealed boxes and two additional chandeliers from the storage unit.

d.  With the assistance of a man introduced only as "Marco," Dunning loaded the bubble-wrapped items into Marco's sedan.

18. On February 24, 2011, I interviewed Tricia Dunning, who confirmed the accuracy of her November 29, 2010, declaration filed in the bankruptcy court, and then stated in substance the following:

a.  Dunning had not seen the items that she bubble-wrapped on August 9, 2010, before that date. The items included gold and silver door knobs.  In addition, Dunning moved some artwork that had been in the storage area.

      b.   Marco stated that DYKSTRA's former housekeeper had stolen the items and that they had stolen them back from the housekeeper.

      c.   Dunning later overheard a telephone conversation between DYKSTRA and Marco in which DYKSTRA complained that Marco was not satisfied, despite the fact that DYKSTRA had given Marco multiple pieces of personal property.

    19. Based on the foregoing, there is probable cause to believe that LENNY KYLE DYKSTRA has violated Title 18, United States Code, Section 153 (Embezzlement Against Estate).


_____/S/_____

Ty A. Thomas
Special Agent, FBI


Subscribed and sworn to before me on April /3, 2011.


_____

HON. SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE